EXHIBIT "A"

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA
FAMILY DIVISION

NANCY JENNINGS,          )
                        )
      Petitioner,     )         Civil Action No.
vs.                  )         2020CV337822
                        )
JEFFREY GALLUPS,      )
                        )
      Respondent.    )

## ORDER COMPELLING COMPLIANCE, APPOINTING RECEIVER, AND GRANTING INJUNCTIVE RELIEF

This matter is before the Court on the Court's motion.

### PROCEDURAL BACKGROUND

1. The Court appointed Frank B. Strickland ("**Special Master**") as Special Master in this Civil Action by the February 8, 2023, *Order for Appointment of Special Master* (the "**Appointment Order**").

### FINDINGS OF FACT

2. The Court makes the following Findings of Fact based upon the July 2, 2023, *Special Master's Report*, and the August 8, 2023, *Special Master's Report and Recommendation Respecting Status of Incremental Transfer of the Companies* (collectively, the "**Special Master Reports**"), the prior testimony of the Parties, and the record of this case.

3. The Court's appointment of the Special Master is in part a consequence of Respondent Jeffrey Gallups' ("**Respondent**") failure to comply with his obligations to Petitioner Nancy Jennings ("**Petitioner**," and collectively with Respondent, the "**Parties**") under the January 2017 *Final Judgment and Decree of Divorce* (the "**Divorce Decree**") entered in their divorce

proceeding, <u>Nancy H. Gallups v. Jeffrey M. Gallups</u>, Civil Action File Number: 2016CV274575, previously pending in this Court.

4.      Pursuant to the terms of that certain Settlement Agreement between Petitioner and Respondent dated as of October 28, 2016 (the "**Divorce Settlement**"), and incorporated into the Divorce Decree, Respondent agreed, in part, to sell, recapitalize, merge, or otherwise transfer his interests in or the assets of each or all of ENTI Surgery Center, LLC ("**ENTI**"), Milton Hall Surgical Associates, LLC ("**Milton Hall Surgical Associates**"), and Alpharetta Surgery Center, LLC f/k/a Milton Hall Surgical Center ("**Alpharetta Surgery Center**") (collectively with ENTI and Milton Hall Surgical Associates, the **"Companies"**) and to use the proceeds thereof to satisfy his non-taxable, lump sum $10.25 million alimony payment, obligation to Petitioner under the Divorce Settlement..   Reference to a "**Company Sale**" herein has the meaning provided in the Divorce Settlement.

5.      Pursuant to Section 6.(b) of the Divorce Settlement,

> [Respondent] shall pledge all of his interest in the Companies in whatever form held, to ensure that [Petitioner] shall receive the [$10.25 million non-taxable alimony and other] payments set forth in subparagraph (c) [of the Settlement Agreement], of [what] [Respondent] receives for his interest in "Companies" (including but not limited to any substituted, merged, acquired, and/or other entity) should there be any transfer for value of [Respondent's] interest in [the three Companies]."

6.      In the Order of this Court entered as part of the Divorce proceedings on May 5, 2021, this Court confirmed that Petitioner holds a valid, perfected security interest and lien on each of the Companies "to secure, in part, [Respondent's] payment to Petitioner of the non-taxable, non-modifiable lump sum alimony payment set forth Section 6 of the Settlement Agreement. Specifically, through the Settlement Agreement, Respondent has pledged the following:

(i) All of [Respondent's] rights, title, and interests, in whatever form held or received, now or hereafter embodied in, or arising out of, Respondent's status as a member, manager, economic interest holder or creditor of the Companies including, but not limited to:

    (a) all of Respondent's economic rights, including, but not limited to, all of Respondent's rights to share in the profits and losses of the Companies, and all of Respondent's rights to receive distributions of the assets of the Companies, and

    (b) all of Respondent's governance rights, including, but not limited to, all of Respondent's rights to vote on, consent to action and otherwise participate in the management of the Companies, together with all proceeds thereof."

7.    The Court's May 20, 2021, Order further provides that "[t]he foregoing security interests shall and do hereby attach automatically, without any further action, to any interest in any of the Companies that Respondent may acquire in the future as well as all of his interest in any of the Companies from October 28, 2016 to the date of this Order and hereafter."

8.    In a subsequent Interim Order Regarding UCC-1 and Amended Motion for Contempt entered on February 17, 2022, the Court confirmed that the lien and security interest granted by Respondent to Petitioner in the Divorce Settlement and described above was and is a valid and enforceable pledge agreement pursuant to the Georgia Uniform Commercial Code.

9.    Section 6.(b) of the Divorce Settlement further provides that "[Respondent] shall use good faith in all dealings with respect to [Petitioner's] interest in his business and Companies, [along with] and any future or other business and Company and will be a fiduciary with respect to [Petitioner's] interest."

10.    The Appointment Order authorizes the Special Master to take all appropriate measures to perform his assigned duties.  These include:

    A. Retaining the services of consultants with expertise in management and marketing of medical practice to ensure that the Companies are being managed properly.

    B. Addressing access by Respondent and his then-wife, Melissa Moritz, to Company funds.

    C. Conducting the sale of one or more of the Companies as soon as possible at a realistic price which results in payment in full of all funds owed to Petitioner under the Divorce Settlement.

11.    Since his appointment and as authorized and directed by the Appointment Order, the Special Master has inquired and attempted to investigate the financial and operational conditions of the Companies.  As described in more detail below, the Special Master has had numerous and ongoing conversations and correspondence with counsel for both Petitioner and Respondent, as necessary for the marketing and sale of the Companies and consistent with the directives of the Appointment Order.

12.    The Special Master has reported to the Court that he has met with instances of delay or refusal of Respondent to reply to financial data requests, incomplete responses when provided, and, most importantly, the refusal to communicate with the Special Master on the structure, status and terms of a Company Sale when the transfer of Respondent's interests in the Companies is immediately necessary to salvage the Companies' eligibility to remain in (or be restored to) the Medicare program and earn significant Medicare revenues.

13.    Following establishment of internal resources, introductions to the parties, and interviewing financial consulting service providers, on April 13, 2023, the Special Master engaged S. Gregory Hays, CTP, CIRA, of Hays Financial Consulting to review the Companies' financial statements, analyze their flow of funds, distributions and expenses paid to related parties, assist with an investment banker to sell the Companies, and perform related services.

14.    Mr. Hays discovered that the Companies are managed by Milton Hall Management, LLC ("**Management Company**").  Respondent directly or indirectly owns 100% of the

Management Company.[1]  Mr. Hays further determined that substantially all of the Companies' revenues were paid to the Management Company not only to pay for the Companies' operating expenses but also to pool the profits of the enterprise for Respondent's own use.  Reference to the "**Gallups Companies**" herein means, collectively, the Companies, the Management Company, and MHSA Management, LLC.

15.    Respondent has only provided limited financial information to the Special Master over the six (6) months the Special Master has been attempting to investigate the financial affairs of the Gallups Companies and arrange a Company Sale. Respondent has not been forthcoming or transparent in his dealings with the Special Master. The Special Master makes the following general observations regarding the Gallups Companies' financial condition, flow of funds and Respondent's access to the cash of the Gallups Companies:

A.    Under penalty of perjury, Respondent provided the U.S. Department of Justice copies of his personal financial statements and the financial statements of the Gallups Companies.  Respondent refused to provide the Special Master with copies of these sworn financial statements.  Respondent has acknowledged he provided financial statements to DOJ but has not provided these to the Special Master.

B.    Respondent has engaged Bankruptcy counsel and counsel specializing in asset protection.  The Special Master has learned that Respondent has recently established certain trusts but Respondent has refused to answer questions and provide the Special Master material information respecting Respondent's asset protection strategies and actions.

C.    Respondent failed to disclose until May 3, 2023, tax liabilities of $1.7 million to IRS and $469K to State of Georgia, and possible related liens on the Companies' assets.

D.    The Companies are currently in a difficult financial position in part due to Medicare's revocation of the Companies' billing privileges, significant amounts paid to the U.S. Government in payment of Respondent's healthcare fraud

---

[1] Respondent's counsel represents that Respondent owns 99% of the membership interests of the Management Company in his own name.  The other 1% is owned by MHSA Management, LLC, which in turn is owned 100% by Respondent.

settlement obligations, substantial legal and other professional fees, and payments to insiders.

E.     The Gallups Companies apparently prepare a weekly cash flow forecast and the forecasts provided to Mr. Hays on June 22  and July 19 do not show receipt of Medicare reimbursements or provide for payment of current payables.

F.     The Gallups Companies distributed approximately $7.5 million to or on behalf of Respondent in 2021 and 2022.

G.     In addition to these distributions, in 2021 and 2022, the Gallups Companies paid $1,580,000 to DRG Media, LLC ("**DRG**"), a Georgia limited liability company organized in 2018 by Respondent and owned by his then-wife Melissa Moritz. DRG was administratively dissolved under Georgia law on October 28, 2022. Despite DRG's dissolution, the most recent cash flow report provided to the Special Master on June 22nd shows that $145,000 has been paid to DRG in 2023 and forecasts monthly payments of $20,000 each in July and August of this year. The Gallups Companies' budget includes a payment of $25,000 per month to DRG, but no justification for this expense has ever been provided to the Special Master.

16.     The Special Master discovered through third-party sources (and not from Respondent) that Respondent and his then wife, Melissa Moritz, filed in Florida for a divorce of their marriage on May 12, 2023, and the divorce decree was entered on June 1, 2023.  The Special Master believes that the divorce occurred, in part, to allow Ms. Moritz, in her capacity as Respondent's former spouse, to control, directly or indirectly, the Companies' governance and finances when Medicare regulations would prohibit a spouse of Respondent to do so.

17.     A partial list of the materials or access to materials requested by the Special Master but not provided as part of his investigation follows:

A.     Financial statements and affidavits provided to the Department of Justice in connection with settlement of criminal and civil cases.

B.     Current status of Company claims billed or to be billed to Medicare and payments or holdbacks from Medicare respecting such claims.

C.     Routine monthly financial reports.

D.     Respondent's personal financial statements including, without limitation, records of any funds or other assets transferred to or held in trusts.

E.      Current cash flow forecasts. The Companies' cash flow forecast appears to be updated weekly but the Special Master only received copies of such forecasts on May 15th, June 22nd and July 19th. The Special Master has requested this information be provided on a weekly basis. The cash flow forecasts do not forecast any payment of Special Master's fees.

F.      Melissa Moritz has served as Chief Executive Officer of the Management Company and Adam Holzhauer formerly served as Vice-President of Finance for the Gallups Companies. Respondent has impeded access to these individual to answer financial and operational questions. In fact, the Special Master was asked to direct all questions posed to Mr. Holzhauer to Respondent's legal counsel, Peter Hasbrouck, instead.

18.     The Special Master's investigations indicate that Respondent tried, but failed, to sell the Gallups Companies during 2022[2]. Respondent's attempts to sell the Gallups Companies picked up again in April of 2023 but have been delayed principally due to Respondent's refusal to relinquish control of the Gallups Companies. This intransigence continues, despite Respondent's legal obligation to relinquish his ownership and management of the Gallups Companies to maintain Medicare privileges due to his 2021 felony conviction of federal Healthcare Fraud and subsequent exclusion from all federal health care programs. Persons or entities participating in the Medicare program, such as the Companies, face civil monetary penalties if they hire an excluded person, such as Respondent, to perform any service for the participating person or entity.

19.     Not long after entry of the Divorce Decree, Dr. Myron Jones filed a q*ui tam* whistleblower civil action against Milton Hall Surgical Associates, Respondent and other entities

---

[2]  The Special Master learned that the private equity firm Zenyth Partners, LLC considered the acquisition of the Gallups Companies in the Spring of 2022. The firm declined the opportunity due, in part, to the adverse effect of the various regulatory penalties imposed on Respondent described herein. The offer included acquisition not only of the Gallups Companies (including, specifically, the Management Company), but also two other health care companies owned by or affiliated with Respondent – ENTI Anesthesia, LLC ("***ENTI Anesthesia***") and HCENTI, LLC ("***HCENTI***"). Respondent's counsel describes HCENTI as a retail hearing aid dispenser. On information and belief, ENTI Anesthesia is a medical practice owned by Respondent that provides anesthesia services at Respondent's ambulatory surgical centers.

on June 20, 2017.[3]  Because the action was filed under seal, neither Respondent nor Petitioner knew of the pending lawsuit.

20.    On December 1, 2021, Respondent entered into a Settlement Agreement ("***Civil Settlement***") with Dr. Jones, the U.S. Department of Justice and other state and federal agencies to settle the civil claims brought against Dr. Gallups and Milton Hall Surgical Associates.  Among other matters, Respondent and/or Milton Hall Surgical Associates agreed to pay the Government $3,068,434, payable $1,000,000 upon execution of the Civil Settlement, with the remainder due in minimum monthly payments of $100,000 each until paid in full no later than December 1, 2022. According to correspondence from one of Respondent's criminal attorneys dated August 9, 2023, the Government has extended the date for final payment of the remaining $599,844.24 outstanding settlement amount to September 5, 2023.

21.    The Civil Settlement further provides that all outstanding amounts due to the Government are accelerated and immediately due and payable if any of a Gallups Company engages in a sale to a non-affiliated entity such as the transactions contemplated by the Company Sale.

22.    On October 21, 2021, Respondent entered a felony guilty plea to the crime of Healthcare Fraud in that certain *Qui Tam* case, <u>United States of America v. Jeffrey M. Gallups</u>, file number 1:21-cr-00370-SCJ, United States District Court for the Northern District of Georgia. As part of a Consent Judgment entered in the criminal action (the "**Consent Judgment**"), Respondent and Milton Hall Surgical Associates agreed to be jointly and severally liable to pay the Government $5,388,863 if Respondent or Milton Hall Surgical Associates default in payment

---

[3] *United States ex rel. Myron Jones, MD., et al. v. Milton Hall Surgical Associates, LLC*, Jeffrey M Gallups, MD., et al., Civil Action. No. 1: l 7-cv-24 72

of the $599,844.24 remaining Civil Settlement amount early next month on September 5, 2023. The Consent Judgment also requires Respondent and/or Milton Hall Surgical Associates to pay the U.S. Government a total of $725,244 in installment payments.

23.     Federal law prohibits convicted felons from owning any debt or equity interest in, or engage as an officer, director or principal manager of, an entity participating in the Medicare program.  *See*, 42 CFR 424.535(a)(3).  Each of the Companies is owned by Respondent and each participates in the Medicare program.  Failure of a felon to transfer his or her ownership in a Medicare enrolled entity within thirty (30) days of conviction is cause for revocation of the entity's Medicare participation.

24.     On April 21, 2023, Respondent's counsel notified the Special Master that the Companies had received correspondence dated April 10, 2023, and April 11, 2023, notifying Respondent that Medicare was revoking Medicare privileges for each of the Companies effective October 21, 2021.[4]  Medicare took this action principally because Respondent failed to timely relinquish his equity interests in the Companies.

25.     Respondent's counsel indicated in his April 21 letter that the revocation might be rescinded if Respondent transferred his Company interests within thirty (30) days of the revocation.[5]  For this reason, Respondent's counsel states that "the transfer of ownership from Dr. Gallups to [one of the physicians working at Milton Hall Surgical Associates] must be completed

---

[4] On April 21, 2023, the Special Master engaged Daniel B. Brown, an attorney at the Special Master's law firm of Taylor English Duma LLP, to advise the Special Master in healthcare regulation, corporate governance, and mergers and acquisitions.  Mr. Brown has practiced health care regulatory and health care M&A law for over twenty-five years.

[5] Counsel explained that two other reasons for revocation might be excused on the grounds of administrative error.  However, these reasons could not be prospectively cured, and some risk of revocation remained notwithstanding steps taken to effect a transfer of Respondent's interests.

as soon as possible.  The transfer showing must be made on or before May 10.  It would be best if this transfer could be completed [seven days later] by next Friday, April 28, 2023."

26.    The Special Master's further communications with Respondent's counsel over the following 3.5 months and efforts to effect the necessary transfer of the Companies, including the Management Company, out of Respondent's ownership and control are more thoroughly discussed in the Special Master reports[6] and are incorporated in these Findings of Fact.

27.    On June 24, 2023, the Special Master sent Respondent's counsel a written proposal setting forth the terms of an "incremental" transaction.  The incremental approach provides for the immediate transfer of physician ownership in the three Medicare enrolled entities (ENTI, Alpharetta Surgery Center and Milton Hall Surgical Associates) to satisfy Medicare reimbursement regulations.  Issues relating to the ownership and control of the Management Company (and, indirectly, the operation of the clinical entities) would be reserved after the clinical entity transfers to relieve the pressure of imminent Medicare eligibility termination.

28.    Respondent has repeatedly rejected the incremental approach.  Respondent has represented, without proof, that each of the potential physician transferees refuse to move forward unless the terms of governance and control of the Management Company are fully resolved.  To Respondent, resolution means that his former spouse, Melissa Moritz, retains day-to-day control of the Management Company.  Respondent has refused to provide access to the potential physician-assignees of the clinical companies or to the potential assignee's legal counsel.

29.    On June 15, 2023, Respondent, by and through his counsel of record in this case, accepted in writing the terms of the incremental transaction structure contained in the Special Master's June 14 correspondence..

---

[6] July 2, 2023, Special Master's Report, ¶¶ 8 through 55; August 8, 2023 Special Master's Report, ¶¶ 2 through 26.

30.    On June 21, 2023, the Special Master prepared and circulated a *Term Sheet Respecting Incremental Transactions Respecting Nancy Jennings, Petitioner, vs. Jeffrey Gallups, Respondent, Superior Court of Fulton County, Georgia, Family Division, Civil Action No. 2020cv337822* (the "**Term Sheet**") for Petitioner, Respondent, and their respective attorneys' review and comment, incorporating the terms which Respondent accepted and agreed to on June 15, 2023.

31.    On July 7, 2023, Respondent, through counsel, informed the Special Master that Respondent was reneging on his agreement.

32.    To date, all efforts to effect the necessary transfer of the Companies have failed in large part due to Respondent's refusal to cooperate with the Special Master.

33.    On July 20 and 21, 2023, and in response to the July 2, 2023, Special Master's Report, the Court conducted hearings, in-person and *via* Zoom, respectively.

34.    The July 20, 2023, hearing was attended by Petitioner and her counsel, Respondent and his counsel, the Special Master and his attorneys and Financial Advisor.

35.    Over the course of nearly four hours, Petitioner, Respondent, the Special Master and his professionals negotiated the Term Sheet and required changes to the Term Sheet.

36.    The Term Sheet, as so modified, was then read into the record in this case and the parties were sworn and Respondent agreed under oath to the terms of the Term Sheet.

37.    . Despite agreeing again to terms, Respondent has once again reneged on his agreement and presently refuses to cooperate in the intended transfer of the Companies and has failed to cooperate and adequately communicate with the Special Master.

38.    Respondent continues to refuse to provide the Special Master full access to the Companies' books and records, including financial records.

39.     Further, Respondent has failed and refused to pay the Special Master's fees and the

fees of professionals engaged by the Special Master as required by the Appointment Order, which,

as of August 13, 2023, are as follows:[7]

| | |
|---|---|
| Special Master | $88,673.84 |
| Daniel B. Brown, Taylor English Duma LLP (Regulatory/M&A Counsel) | $47,417.50 |
| S. Gregory Hays, Hays Financial Consulting | $49,336.40 |
| | |
| TOTAL (as of August 7, 2023) | **$185,427.74** |

40.     On August 14, 2023, Respondent's counsel informed the Special Master in writing

of that:

a.   Respondent withdrew the opportunity of the "friendly doctor" named in the Term Sheet to participate in the Companies' transfer transaction in favor of John Lloyd, M.D., Georgia-licensed emergency room physician ("**Dr. Lloyd**").  Respondent substituted Dr. Lloyd without informing either the Special Master or Respondent's own counsel.

b.   Without the knowledge or consent of either the Special Master or Respondent's litigation counsel, and during the first week in August, 2023, when the Special Master Respondent was working in good faith on a transaction plan with Respondent's counsel, Respondent had his corporate counsel draft and deliver transaction documents providing for Respondent's (i) transfer of his ownership interest in the Companies to Dr. Lloyd, and (ii) the creation on August 7, 2023, of a totally new management company called Nutmeg Management, LLC **("Nutmeg Management")** owned and managed 100% by Melissa Moritz ("**Moritz**") into which the Companies' non-clinical operating assets were contributed (the "**Covert Transaction Documents**");

c.   Without the knowledge or consent of either the Special Master or Respondent's litigation counsel, Respondent and Moritz signed the Covert Transaction Documents applicable to the formation and capitalization of Nutmeg Management on August 7, 2023,

d.   Without the knowledge or consent of either the Special Master or Respondent's litigation counsel, Respondent and Dr. Lloyd (who likely acted without proper context) signed the Covert Transaction Documents effecting the transfer of ownership of the Companies from Respondent to Dr. Lloyd, all on August 7, 2023;

e.   Respondent's covert transfer of the Companies to Dr. Lloyd, and Respondent's covert transfer of the non-clinical assets of the Companies into Nutmeg

---

[7] *See Special Master's Report of Accrued and Unpaid Fees as of August 13, 2023.*

Management violates the Divorce Settlement and may cause the acceleration of amounts due to U.S. Government under the Civil Settlement;

f.  Respondent's covert transfer of the Companies to Dr. Lloyd, and Respondent's covert transfer of the non-clinical assets of the Companies into Nutmeg Management constitutes a fraudulent transfer under O.C.G.A. § 18-2-77;

g.  Milton Hall Surgical Associates, LLC's VP of Finance, Adam Holzhauer has resigned;

h.  Respondent's criminal attorney has advised Respondent that Respondent's anticipated failure to pay his Civil Settlement payment of $599,844.24 by September 5, 2023 could trigger the joint and several obligation of Respondent and Milton Hall Surgical Associates to pay the Government a default penalty of $5,388,863 under the Consent Judgment.  Such event "could result in very significant and irreversible adverse consequences to both [respondent] and [Management Company]"; and

i.  Respondent and/or the Gallups Companies are in default of rent payment obligations at two (2) locations.

41.  Respondent's actions violate the Settlement Agreement in many respects, including but not limited to his breach of fiduciary duty to Petitioner with respect to her interest in the Companies.

## CONCLUSIONS OF LAW

42.  Georgia law provides:

Equity may appoint a receiver to take possession of and hold, subject to the direction of the court, any assets charged with the payment of debts where there is manifest danger of loss, destruction, or material injury to those interested. Under extraordinary circumstances, a receiver may be appointed before and without notice to the trustee or other person having charge of the assets. The terms on which a receiver is appointed shall be in the discretion of the court.

O.C.G.A. § 9-8-3.

43.  Additionally, in fraudulent transfer cases such as this, O.C.G.A. § 18-2-77 broadly authorizes the Court to appoint a receiver "to take charge … of other property of the transferee [*i.e.,* Dr. Lloyd and Melissa Moritz]" and to grant "any other relief the circumstances may require."

44. The appointment of a receiver is appropriate where the person who is managing the property seems inimical to its best interests and where their actions have the effect of rendering any remedy at law meaningless. D.C. Micro Development, Inc. v. Lang, 259 Ga. App. 611, 578 S.E.2d 251 (2003); Warner v. Warner, 237 Ga. 462 (1976).

45. Further, this Court has broad discretion to decide whether the circumstances are sufficiently clear and urgent enough to warrant a receiver even though the facts relevant to the determination are in conflict. Nayyar v. Bhatia, 348 Ga. App. 789 (2019). Evidence, "suggesting the possibility that [assets are] being diverted and that assets might be dissipated before the case can be resolved," has been held to be sufficient to support the appointment of a receiver. D.C. Micro Development, Inc. v. Lang, 259 Ga. App. 611, 578 S.E.2d 251 (2003).

46. Respondent's established record in this case shows his persistent (i) manipulation of the businesses of the Companies to divert assets to himself *via* DRG and/or other avenues, (ii) refusal to provide the Special Master with financial and other business information, (iii) ongoing obstruction of the transfer of the Companies under the direction of the Special Master simply so he could retain direct or indirect control of the Companies, (iv) surreptitiously transferring his interests in and the assets of the Companies to Dr. Lloyd and Melissa Moritz in direct violation of the Divorce Settlement, the *Qui Tam* Civil Settlement, Petitioner's security interest in the Companies, and the fiduciary duty owed to Petitioner under the Divorce Settlement.

47. Such violations all constitute extraordinary circumstances and give rise to a manifest danger of continued loss, destruction, and dissipation of and material injury to the Companies. See D.C. Micro Development, Inc. v. Lang, 259 Ga. App. 611, 578 S.E.2d 251 (2003); Lemans Associates Limited Partnership v. Lemans Apartments, 268 Ga. 396, 489 S.E.2d 831 (1997).

48.     Respondent's failure to protect the assets of the Companies by diverting Company assets, failing to transfer his interests in a timely manner to avoid Medicare revocation, and engaging in felonious conduct all wrongfully diminished the economic value of the Companies in violation of Respondent's fiduciary duty owed to Petitioner in the Divorce Settlement.

49.     Further, this Court has broad discretion to decide whether the circumstances are sufficiently clear and urgent enough to warrant a receiver even though the facts relevant to the determination are in conflict.  Nayyar v. Bhatia, 348 Ga. App. 789 (2019).  Evidence, "suggesting the **possibility** that [assets are] being diverted and that assets might be dissipated before the case can be resolved," has been held to be sufficient to support the appointment of a receiver.  D.C. Micro Development, Inc. v. Lang, 259 Ga. App. 611, 578 S.E.2d 251 (2003).

50.     The Court finds that Respondent directly or indirectly controls (or has fraudulently transferred the assets or control) of certain entities affiliated with Respondent, including, without limitation:

A.     Milton Hall Surgical Associates, LLC

B.     Alpharetta Surgery Center, LLC

C.     ENTI Surgery Center, LLC

D.     HCENTI, LLC

E.     ENTI Anesthesia, LLC

F.     Milton Hall Management, LLC

G.     MHSA Management, LLC

H.     Milton Hall Trust

I.     Nutmeg Management LLC

J.     Marble Management, LLC

K.    DRG Media, LLC

L.    All other operating entities, holding companies, debt arrangements, voting trusts, or other trusts or entities of any kind, known or unknown, directly or indirectly controlled by Respondent or Moritz.

51.    For purposes of this Order, the term "**Affiliated Entities**" means the entities listed in Subsections (A) through (L).

52.    In addition to the direct or indirect control of the Affiliated Entities, the Respondent possesses, owns or controls (directly or indirectly) certain personal property. Such personal property of Respondent includes, without limitation, cash, bank accounts, money market accounts, investment accounts, other accounts and the property contained therein in financial institutions wherever located, real estate and all interests related to real estate, such as rent, mortgages, mineral or timber rights, jewelry, art, household furnishings, vehicles, boats, aircraft, stocks, partnership interests, limited liability company membership or other economic interests, bonds, promissory notes and all notes receivable, debt instruments, option or futures contracts, negotiable instruments, all intellectual property rights, domain names, and all other assets of Respondent of any class or manner (collectively, the "**Respondent's Assets**").

53.    Respondent could have applied a portion of his personal assets to support the Companies in furtherance of a Company Sale. Alternatively, Respondent could have used his personal wealth to support an organized transfer of his Company ownership promptly after his felony conviction required under Medicare rules to protect the Company's Medicare participation. Respondent has instead insisted on retaining direct or indirect control of the Affiliated Entities. As a consequence, the Companies face imminent expulsion of Medicare reimbursement, possible eviction from their office spaces due to failure to pay rent, and considerable waste of time and

money as Respondent engineered a series of failed transfer transactions through which he could retain control, all during the span of the Special Master's appointment.

54.    For purposes of this Order, the term "**Gallups Group**" means both (a) Respondent and (b) the Affiliated Entities.

55.    For purposes of this Order, the term "**Receivership Assets**" means all of (i) the Respondent's Assets and (ii) the assets of the Affiliated Entities, in each case consisting of assets of all class and manner and wherever situated.

56.    Given these findings of fact and conclusions of law and for good cause shown, the Court concludes that, pursuant to the separate and independent statutory grounds of O.C.G.A. §§ 9-8-1, 9-8-3, and 18-2-77, the appointment of a receiver to provide oversight of the Gallups Group and to marshal, preserve, and provide oversight of Receivership Assets is necessary to protect Petitioner's rights and to prevent manifest and imminent loss, destruction, and/or dissipation of the Receivership Assets.

57.    The Court further concludes that immediate and irreparable injury may result to Petitioner in the event a receiver is not appointed to oversee and preserve all such assets of the Gallups Group.

**THEREFORE, THE COURT HEREBY ORDERS** the appointment of a receiver as follows:

1.    This Court hereby takes exclusive jurisdiction and possession of the Receivership Assets of whatever kind and wherever situated.

2.    Until further Order of this Court, **S. Gregory Hays** at Hays Financial Consulting, LLC, 2964 Peachtree Rd #555, Atlanta, GA 30305, is hereby appointed to serve without bond as receiver ("**Receiver**") of the Gallups Group and the Receivership Assets.

3.    This Order is supplemental to and not in substitution of the Appointment Order.  The Special Master shall retain all of his powers and authorities under the Appointment Order, including oversight of the Receiver's performance of his duties and authorities granted hereunder. References herein to "reports to the Court" or such other communications from the Receiver to the Court shall mean reports or communications to the Special Master in his role as Special Master in this case.  However, any reference to any action requiring "an order of this Court" hereunder shall mean the entry of an order of this Court on motion or recommendation of the Special Master.

4.    Nothing in this Order shall be deemed to modify the Divorce Settlement or any of Respondent's obligations under the Divorce Settlement, unless first approved by the Special Master and then by an Order of this Court.

5.    The date and time of the entry of this Order on the Court's docket shall be referred to herein as the "**Effective Date**".

6.    As of the Effective Date, the Receiver is authorized and directed to pay from the Receivership Assets the outstanding and owing fees and costs of the Special Master and his professionals, as follows:

| | |
|---|---|
| Special Master | $88,673.84 |
| Daniel B. Brown, Taylor English Duma LLP | |
| (Regulatory/M&A Counsel) | $47,417.50 |
| S. Gregory Hays, Hays Financial Consulting | $49,336.40 |
| TOTAL (as of August 13, 2023) | **$185,427.74** |

7.    As of the Effective Date, the Receiver is authorized and directed to pay from the Receivership Assets each of the Special Master and the Receiver's office a retainer of $25,000.00. Receiver shall replenish the retainers to $25,000.00 within five (5) calendar days from any subsequent notice by the Special Master that the balance of Special Master's retainer is $10,000.00

or less. The Receiver may replenish his own retainer in similar manner as determined by the Receiver.

8.     As of the Effective Date, the Receiver is authorized and directed to pay from the Receivership Assets all of the attorney's fees incurred by Petitioner as of August 15, 2023, in the approximate amount of $250,000.  The Receiver shall pay Petitioner's attorneys fees from the Receivership Assets as they are incurred going forward until Petitioner is paid in full.

### I.     Asset Freeze & Injunction

9.     Except as otherwise specified herein and as necessary for the Receiver to carry out his powers and duties, all Receivership Assets are frozen until further order of this Court.  Defendant Respondent and all other persons, businesses, financial institutions, and entities with direct or indirect control over any Receivership Assets, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, withdrawing, setting off, receiving, changing, selling, pledging, assigning, liquidating, encumbering, or otherwise disposing of or withdrawing such assets.  This freeze shall include, but not be limited to, Receivership Assets (i) that are in the possession or control of Dr. Lloyd and/or Melissa Moritz, or any entity in which they have an interest, and (ii) that are on deposit with financial institutions such as banks, brokerage firms and mutual funds or in the possession or held or paid for the benefit of Respondent by any family member, relative, officer, director, partner, employee, business, or other agent or affiliate of Respondent.

10.   Respondent Dr. Lloyd and Melissa Moritz shall be further enjoined from taking any action or making any decision without the prior written approval of the Receiver that may affect or impact any Receivership Assets.  This provision notwithstanding, the Receiver is authorized to delegate day-to-day business authority at his discretion and in his sole business judgment.

11. Respondent shall be further enjoined from transferring any funds or directing or approving the transfer of any funds into or out of any bank account, investment account, or other account that he controls without notifying the Receiver and obtaining the Receiver's prior written consent to the transfer of funds.

12. Respondent shall continue to timely pay to Petitioner the alimony as set forth in the Settlement Agreement. Should Respondent fail to timely pay to Petitioner the alimony as set forth in the Settlement Agreement, the Receiver is authorized to pay said sums to Petitioner from the Receivership Assets.

## II.    General Powers and Duties of Receiver.

13. The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by Respondent with respect to the Receivership Assets under applicable state and federal law and under any governing charters, by-laws, articles, contracts, and/or agreements, in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of O.C.G.A §§ 9-8-1, 9-8-3, and 18-2-77.

14. No person, other than the Receiver, shall possess any authority to act by or on behalf of the Gallups Group with respect to the Receivership Assets.

15. In addition to the specific provisions in Articles III through XIII below, the Receiver shall have the following general powers and duties:

 i. To use reasonable efforts to determine the nature, location and value of all Receivership Assets, including but not limited to, including, but not limited to, property interests, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, ownership interests, stocks, membership interests, partnership interests, and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Respondent owns, possesses, has a beneficial interest in, or controls directly or indirectly;

 ii. To communicate directly with and coordinate and cooperate with Special Master

or any auditor or in identifying the nature, location, and value of all Receivership Assets;

iii.   To require the production by Respondent and any affiliated business entity owned, managed, or controlled by Respondent of any documents, financial and accounting records, shareholders' agreements, membership agreements, partnership agreements, employment records, tax returns, financial statements, computer files, computer databases, and any and all other documents and records evidencing, relating, or pertaining to any assets of the Gallups Group which are to be provided or paid to the Receiver under this Order;

iv.   To take custody, control and possession and to the turnover of all Receivership Assets and records relevant thereto from Respondent or any other person or entity in possession of the same, including, but not limited to, property interests, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, ownership interests, stocks, membership interests, partnership interests, and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Respondent owns, possesses, has a beneficial interest in, or controls directly or indirectly; to sue for and collect, recover, receive and take into possession from third parties all Receivership Assets and records relevant thereto;

v.   To exercise all voting rights and other rights possessed by Respondent, Dr. Lloyd or Moritz under any stockholders' agreement, membership agreement, partnership agreement, governing charters, by-laws, or other similar agreements of any entities holding any Receivership Assets;

vi.   To manage, control, operate and maintain the Gallups Group and hold in his possession, custody and control all Receivership Assets, pending further Order of this Court;

vii.   To use Receivership Assets for the benefit of the Gallups Companies and Petitioner, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

viii.   To open bank accounts, to close bank accounts and to change the names of any signatories on such accounts as the Receiver deems appropriate in his sole discretion;

ix.   To take any action which, prior to the entry of this Order, could have been taken by Respondent, Moritz, or their respective managers, consultants, trustees, and agents with respect to Receivership Assets;

x.   To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

xi.     To take such action as necessary and appropriate for the preservation of Receivership Assets or to prevent the dissipation or concealment of Receivership Assets;

xii.    To issue subpoenas for documents and testimony consistent with the Georgia Rules of Civil Procedure;

xiii.   To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

xiv.    To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Gallups Group;

xv.     To oversee and exercise approval authority over any decision or action by Respondent which may directly or indirectly impact the Receivership Assets or the Gallups Group;

xvi.    To oversee and exercise approval authority all transfers of funds by Respondent and the Gallups Group from any bank account that owned or controlled to or from any family member, significant other, or business entity that Respondent or a Gallups Group member owns, has an interest in, or controls;

xvii.   To render reports to the Court as set forth in Section XI below and as otherwise directed or requested by the Court;

xviii.  To make payments or distribute Receivership Assets to Petitioner pursuant to the Divorce Settlement, including but not limited to alimony and attorneys' fees, as well as principal payments towards Respondent's obligation to pay Petitioner $10,250,000 tax free to Petitioner;

xix.    To communicate directly with all banks and financial institutions to ensure that no distribution or transfer of Receivership Assets is made by Respondent or his successor at a Gallups Group (personally or as the authorized representative of a Respondent controlled company) without notice to and the express approval and consent of the Receiver;

xx.     To sell or liquidate Receivership Assets for purposes of payment of Respondent's obligations under Divorce Settlement;

xxi.    To approve a reasonable budget for living expenses and to pay such amounts to Respondent out of the Receivership Assets;

xxii.   To petition the Court to expand the receivership to include the assets of other persons, businesses, or entities to the extent the Receiver reasonably believes that such assets should be added; and

xxiii.    To take such other action as may be approved by the Court.

### III.    Access to Information

16. Respondent and his employers, affiliated companies, subsidiaries, joint venture partners, related companies, and any officers, managers, employees, agents, representatives, attorneys, accountants, banks, contractors, subcontractors of each, and all who claim under them, and all other non-parties who have been or may be served with discovery by Receiver, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, Respondent and/or all Receivership Assets; such information shall include but not be limited to all instruments, papers, documents, records, bank accounts, trust accounts, deposit accounts, saving accounts, money market accounts, and all other demand deposit accounts, inventory, supplies, patient lists, owners' lists, computer files, computer databases, sales and marketing materials, and any and all other documents and tangible things evidencing or relating to any Receivership Assets.

17. Within two (2) days of the Effective Date, Respondent shall provide the Receiver with full and complete copies of the Covert Transaction Documents.

18. Within ten (10) days of the Effective Date, Respondent shall file with the Special Master and serve upon the Receiver a sworn statement, and accounting, with complete documentation, covering the period from January 1, 2019 to the present:

        i.      Of all Receivership Assets, wherever located, held by or in the name of Respondent or Moritz, or in which he or she, directly or indirectly, has or had any beneficial interest, or over which he maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry, furniture, gold or other precious metals, and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage or other financial institution held by, in the name of, or for the benefit of him, directly or indirectly, or over which he maintained or maintains and/or exercised or exercises any direct or indirect

       control, or in which he had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution;

ii.      Identifying every account at every bank, brokerage or other financial institution: (a) over which Respondent or Moritz has signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, Respondent or Moritz;

iii.     Identifying all credit, bank, charge, debit or other deferred payment cards issued to or used by Respondent and Moritz, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

iv.     Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

v.      Of all expenditures exceeding $5,000 made by Respondent or Moritz, including those made on their behalf by any person or entity; and

vi.     Of all transfers of assets made Respondent or Moritz.

19.  Within ten (10) days of the Effective Date of this Order, Respondent shall provide to the Receiver copies of Respondent's unredacted copies of federal and state income tax returns for the Gallups Group for taxable years 2019-present with all relevant and necessary underlying documentation.

20.  Within ten (10) days of the Effective Date, Respondent shall provide to the Receiver copies of all personal and consolidated financial statements of the Gallups Group with all relevant and necessary underlying documentation.

21.  Within ten (10) days of the Effective Date, Respondent shall provide to the Receiver copies of financial statements or other documents provided to any bank, investor, or lender from 2018 to present to demonstrate the assets of the Gallups Group and net worth for purposes of obtaining credit or an investment.

22.   Respondent and Moritz shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of Respondent and the Receivership Assets.

23.   Respondent and Moritz are required to assist the Receiver in fulfilling his duties and obligations.  As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

**IV.    <u>Turnover of Assets and Access to Books, Records and Accounts</u>**

24.   The Receiver is authorized to take immediate possession of all Receivership Assets of any kind and wherever situated, including but not limited to, including, but not limited to, property interests, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, ownership interests, stocks, membership interests, partnership interests, and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Respondent owns, possesses, has a beneficial interest in, or controls directly or indirectly.  Respondent and all other persons and entities having control, custody or possession of any Receivership Assets are hereby directed to turn such property over to the Receiver.

25.   The Receiver is authorized to take immediate possession of any and all account user-names and passwords, books and records, bank account, investment account, or other financial account information, and all other documents or instruments relating to Respondent, Moritz and the Receivership Assets. Respondent and all other persons and entities having control, custody or possession of any account usernames and passwords, books and records, bank accounts or other financial accounts, and all other documents or instruments relating to Respondent and the Receivership Assets are hereby directed to turn the same over to the Receiver.  The Receiver is entitled to change any usernames or passwords for any bank account, investment account, or other

financial account relating to the Receivership Assets.

26. Respondent, as well as his agents, servants, employees, attorneys, businesses, and any persons or entities acting for or on behalf of Respondent, and any persons receiving notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of Respondent are hereby directed to deliver the same to the Receiver, his agents and/or employees.

27. All business entities, banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, and of Respondent or Moritz that receive actual notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise shall:

    i. Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Respondent except upon instructions from the Receiver;

    ii. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

    iii. Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice;

    iv. To update that statement at least monthly; and,

    v. Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

**V.**     **Access to Real and Personal Property**

28. The Receiver is authorized to take immediate possession of all personal property of

Respondent, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies and equipment. Respondent and all other persons and entities having control, custody or possession of any such property are hereby directed to turn such property over to the Receiver.

29. The Receiver is authorized to take immediate possession of all real property of Respondent, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or (c) destroying, concealing or erasing anything on such premises. Respondent and all other persons and entities having control, custody or possession of any such property are hereby directed to turn such property over to the Receiver.

30. In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. Respondent, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

31. The Receiver is authorized to open all mail directed to or received by or at the offices

or post office boxes of Respondent, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

32.   Upon the request of the Receiver, local sheriffs and law enforcement is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody and control of, or identify the location of, any assets, records or other materials belonging to the Receivership Estate.

VII.   **Notice to Third Parties**

33.   The Receiver shall promptly give notice of his appointment to all known banks, investors, financial institutions, businesses, officers, directors, agents, employees, shareholders, creditors, debtors, managers and general and limited partners of Respondent, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

34.   All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to Respondent shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if Respondent had received such payment.

35.   In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the assets vested in the Receiver.  All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver.

36.   The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations or activities of any of the Gallups Group (the "**Receiver's Mail**"), including all mail addressed to, or for the benefit

of, Respondent. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. Respondent shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of Respondent or Moritz, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented or used by Respondent. Respondent shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository or courier service.

37. Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage or trash removal services to the Gallups Companies shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

## VIII.    Injunction Against Interference with Receiver

38. Respondent and all persons, financial institutions, businesses, and entities receiving notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

   i.    Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Assets; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin,

execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Assets;

ii.    Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

iii.    Dissipate or otherwise diminish the value of any Receivership Assets; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing judgments, assessments or claims against any Receivership Property, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Gallups Group or which otherwise affects any Receivership Property;

iv.    Make any payment or transfer of funds by or on behalf of Respondent without providing notice and obtaining the express written approval of the Receiver; or,

v.    Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate.

39.    Respondent and all persons, financial institutions, businesses, and entities receiving notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise shall fully cooperate with and assist the Receiver in the performance of his duties.

40.    The Receiver shall promptly notify the Special Master of any failure or apparent failure of Respondent or any persons, financial institutions, businesses, and entities to comply in any way with the terms of this Order.

## IX.    **Managing Assets**

41.    The Receiver is authorized to establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Assets (the "Receivership Funds"). The Receiver is authorized to continue using existing accounts as he deems appropriate

in his business judgment.

42. The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Assets, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership, and with due regard to the realization of the true and proper value of such Receivership Assets.  The Receiver, with approval of the Court, may also transfer, liquidate, compromise, or otherwise dispose of any Receivership Assets for purposes of operating the Gallups Group.

43. The Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership.

44. The Receiver is authorized to take all actions to manage, maintain, and/or wind- down business operations of the Receivership, including making legally required payments to creditors, employees, and agents of the Receivership and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

45. The Receiver shall not be required to file tax returns on behalf of the Gallups Companies.  Respondent shall be responsible for filing all tax returns in the ordinary course of business, and to the extent taxes are due shall be responsible for notifying the Receiver and requesting payment from the Receivership Assets.  Receiver shall not be responsible for past or future filings of Federal or State income tax returns respecting the Gallups Group.

## X.   Insurance

46. Given the urgency of the situation to appoint a Receiver, the Receiver accepts this appointment without time for independent verification that appropriate insurance is in place on the

property or that appropriate liability or other insurance is in place to protect the Receivership Assets. Accordingly, the Court acknowledges that the Receiver has no responsibility or liability until such time as he/it can confirm that such insurance is in place or acquire the appropriate insurance. The Receiver will make it apriority to verify or obtain insurance coverage immediately upon this Order Appointing Receiver being entered; however, the Plaintiff, Defendant and Court acknowledge there may be a gap of time before such insurance may be in place to properly protect the assets of the estate and any employees of the estate, and that the Receiver has no responsibility or liability until such time as he/it has notified the Court by filing a notice that insurance is in place.

47. Respondent is ordered to immediately provide the Receiver with all available insurance information for both existing and prior insurance policies. This includes all applications, policies, riders, correspondence, endorsements, claims and other information.  Respondent is ordered: (1) to advise the insurance agent(s) of this Order in writing, (2) designate all authority over the policies to the Receiver, and (3) take no action with regard to terminating or modifying existing insurance policies.

48. Any insurance broker, agent, carrier, or underwriter is specifically ordered by the Court to cooperate with the Receiver by timely furnishing the following: (1) copies of all insurance policies including any riders, endorsements and applications with respect to policies related to the Receiver Estate, (2) loss history for five consecutive years or for as long as insurance has been in force if less than five years, (3) premium payment history including current status, and (4) any correspondence with insurance agents, brokers and companies. Policies shall be endorsed by Respondent naming the Receiver as Named Insured and Loss Payee effective the date of this Order as appropriate to the type of coverage, and evidence of this policy endorsement shall be promptly supplied to the Receiver.

49. The Receiver is hereby authorized to engage insurance brokers and consultants as necessary to properly insure the assets of the Receivership.

## X.        Liability of Receiver

50. Until further Order of this Court, the Receiver shall not be required to post bond in accordance with O.C.G.A. § 9-8-10 or give an undertaking of any type in connection with his fiduciary obligations in this matter.

51. The Receiver and his agents, acting within scope of such agency ("**Retained Personnel**") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

52. Except for an act of gross negligence or willful misconduct, the Receiver and all persons engaged or employed by him shall not be liable for any loss or damage incurred by the parties, or any other person by reason of any act performed or omitted to be performed by them in connection with the discharge of their duties and responsibilities in this matter.

53. This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

54. In the event the Receiver decides to resign, the Receiver shall first give written notice to Special Master, counsel of record of Petitioner and to the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

---

## XI.    Recommendations and Reports

55.  Within thirty (30) days of the Effective Date, the Receiver shall file a status report with the Court. The status report will include a summary of receivership activities to date. It will also include a proposed plan for administering the receivership going forward.

56.  Within sixty (60) days after the entry of this Order and quarterly thereafter, the Receiver shall file and serve a full report and accounting of the Receivership (the "**Quarterly Status Report**"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Assets, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership.

57.  The Quarterly Status Report shall contain the following:

     i.     A summary of the operations of the Receiver;

     ii.     The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

     iii.     A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

     iv.     A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

     v.     A list of all known creditors with their addresses and the amounts of their claims; and

     vi.     The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

## XII.    Fees, Expenses and Accountings

58. The Receiver need not obtain Court approval prior to the disbursement of

Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

59.    The Receiver is authorized to solicit persons and entities ("**Retained Personnel**") to assist him in carrying out the duties and responsibilities described in this Order.

60.    The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Assets. Such compensation shall require the prior approval of the Special Master.  The Receiver will be paid pursuant to O.C.G.A. § 9-8-13©.

### XIII.    <u>Miscellaneous</u>

61.    A failure by Respondent to fully cooperate with the Receiver or otherwise comply with this Order shall be under penalty of contempt of court, and the Receiver may request supplemental authority from the Special Master upon proper motion, if necessary, to obtain the cooperation of the Respondent or any other persons or entities acting on behalf of or for the Respondent, to comply fully and completely with this Order.

62.    Receiver shall have all rights, responsibilities, and powers set forth by this Order and all rights, responsibilities, and powers granted to the Special Master by the Appointment Order.

63.    The Receiver is authorized to communicate with all persons, entities and the attorneys for such persons and entities as he deems appropriate to inform them of the status of this matter and the financial condition of the Gallups Group.

64.  This Order shall remain in full force and effect until further order of this Court.

**SO ORDERED this 16TH day of August, 2023.**


_____
Honorable Craig L. Schwall Sr.
Judge, Superior Court of Fulton County
Atlanta Judicial Circuit


Order Prepared and Presented by:


TAYLOR ENGLISH DUMA LLP

/s/ John K. Rezac
John K. Rezac
Georgia Bar No. 601935
1600 Parkwood Circle, Suite 200
Atlanta, Georgia  30339
Tel: 770.434.6868
Fax: 770.434.7376
jrezac@taylorenglish.com

*Attorneys for Frank B. Strickland,*
        *in his capacity as Special Master*